MOORE, Chief Justice
(concurring specially).
On June 26, 2015, by a bare 5-4 majority, the United States Supreme Court declared that all states must now recognize a fundamental right to “same-sex marriage.” Obergefell v. Hodges, 576 U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). Because the Alabama Supreme Court had previously issued orders in this case directing the probate judges of this State not to issue marriage licenses to couples of the same sex, the Court requested briefing on the effect of Obergefell on those orders. See Ex parte State ex rel. Alabama Policy Inst., 200 So.3d 495 (Ala.2015). Today this Court by order dismisses all pending motions and petitions and issues the certificate of judgment in this case. That action does not disturb the existing March orders in this case or the Court’s holding therein that the Sanctity of Marriage Amendment, art. I, § 36.03, Ala. Const.1901, and the Alabama Marriage Protection Act, § 30-1-19, Ala.Code 1975, are constitutional. Therefore, and for the reasons stated below, I concur with the order.
In particular, I agree with the Chief Justice of the United States Supreme Court, John Roberts, and with’ Associate Justices Antonin Scalia, Clarence Thomas, and Samuel Alito, that the majority opinion in Obergefell has no basis in the law, history, or tradition of this country. Obergefell is an unconstitutional exercise of judicial authority that usurps the legislative prerogative of the states to regulate their own domestic policy. Additionally, Obergefell seriously jeopardizes the religious liberty guaranteed by the First Amendment to the United States Constitution.

I. Amending the United States Constitution by Judicial Fiat

Based upon arguments of “love,” “commitment,” and “equal dignity” for same-sex couples, five lawyers, as Chief Justice Roberts so aptly describes the Obergefell majority, have declared a new social policy for the entire country. As the Chief Justice and Associate Justices Scalia, Thomas, and Alito eloquently and accurately demonstrate in their dissents, the majority opinion in Obergefell is an act of raw power with no ascertainable foundation in the Constitution itself. The majority presumed to legislate for the entire country under the guise of interpreting the Constitution.

A. Amending the Constitution in Violation of Article V

In reality, the Obergefell majority presumes to amend the United States Constitution to create a right stated nowhere therein. That is a lawless act. The Constitution in Article V provides the only means for amending its provisions:
“The Congress, whenever two thirds of both Houses shalldeem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, *566 when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof....”
U.S. Const-., art. V (emphasis added). The amendment pi-ocess requires the ratification of three-quarters of the states, not a mere 5 out of 9 Justices on the Supreme Court. The Obergefell majority states that the Founders anticipated that the Constitution might require alteration. Employing Justice Anthony Kennedy’s signature rhetoric, the opinion states:
“The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning.”
576 U.S. at -, 135 S.Ct. at 2598. I submit that our Founders knew a lot more about freedom than this passage indicates. They secured the freedoms we enjoy, not in judicial decrees of newly discovered rights, but in the Constitution and amendments thereto. That a majority of the Court may identify an “injustice” that merits constitutional correction does not dispense with the means the Constitution has provided in Article V for its own amendment.
Although the Court could suggest that the Constitution would benefit from a particular amendment, the Court does not possess the authority to insert the amendment into the Constitution by the vehicle of a Court ..opinion and then to demand compliance with it. In 1965 Justice Hugo Black, in a critique of such judicial activism, commented on the Court’s discovery of a heretofore unknown constitutional right for married couples to use contraception — a right supposedly found in the “penumbra” of the Bill of Rights. He stated:
“The Constitution makers knew the need for change and provided for it. Amendments suggested by the people’s elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being somewhat old-fashioned I must add it is good enough for me.”
Griswold v. Connecticut, 381 U.S. 479, 522, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Black, J., dissenting). In 1983, Brevard Hand, the Chief Judge of the United States District Court for the Southern District of Alabama, stated: “Amendment through judicial fiat is both unconstitutional and illegal. Amendment through judicial fiat breeds disrespect for the law, and it undermines the very basic notion that this country is governed by laws and not by men.” Jaffree v. Board of Sch. Comm’rs of Mobile Cty., 554 F.Supp. 1104, 1126 (S.D.Ala.1983), rev’d Jaffree v. Wallace, 705 F.2d 1526 (11th Cir.1983). George Washington warned against attempts to usurp the Article V revision process:
“If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way, which the constitution designates. But let there be no change by usurpation; for, though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed.”
Farewell Address (September 17,1796), 12 The Writings of George Washington 226 (Jared Sparks ed., 1838) (emphasis added).
Novel departures from the text of the Constitution by the Court are customarily accompanied by pretentious language em *567 ployed to conceal the illegitimacy of its actions. Justice Scalia in his Obergefell dissent refers to this abandonment of “disciplined legal reasoning” as a descent into “the mystical aphorisms of the fortune cookie.” 576 U.S. at -n. 22, 135 S.Ct. at 2630 n. 22. Among some of the more ostentatious phrases used in the majority opinion that might be more suitable to a romance novel are the following:
• “Marriage responds to the universal fear that a lonely person might call out only to find no one there.” 576 U.S. at -, 135 S.Ct. at 2600.
• The “hope [of homosexuals] is not to be condemned to live in loneliness, excluded from one of civilization’s oldest institutions.” 576 U.S. at -, 135 S.Ct. at 2608.
• “A truthful statement by same-sex couples of what was in their hearts had to remain unspoken.” 576 U.S. at -, 135 S.Ct. at 2596.
The opinion appeals more to emotion than law, reminding one of the 1974 song “Feelings” by Morris Albert, which begins: “Feelings, nothing more than feelings .... ” The Court’s opinion speaks repeatedly of homosexuals being humiliated, demeaned, and denied “equal dignity” by a state’s refusal to issue them marriage licenses. The majority seeks to invoke the grief, sorrow, and compassion associated with a Greek tragedy. Riding a tidal wave of emotion, the ensuing tears and pathos then suffice to fertilize a new constitutional right nowhere mentioned in the Constitution itself.
Abandoning the role of interpreting the written Constitution, the majority has instead decided to become the. supposed “voice” of the people, discerning the people’s sentiments and updating the document accordingly. The function of keeping the Constitution up with the times, however, has not been delegated to the Court— or to Congress or the President; that function is reserved to the states under Article V. Alexander Hamilton stated: “Until the people have, by some solemn and authoritative act, annulled or changed the established form, it is binding upon themselves collectively, as well as individually; and no presumption, or even knowledge, of their sentiments, can warrant their representatives in a departure from it, prior to such an act.” The Federalist No. 78, at 527-28 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). Obergefell is a clear example of such “presumption.” Consider the following quotations from the majority opinion:
• “When new insight reveals discord between the Constitution’s central protections and a received legal stricture, a claim to liberty must be addressed.” 576 U.S. at -, 135 S.Ct. at 2598 (emphasis added).
• “The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest.” 576 U.S. at -, 135 S.Ct. at 2602 (emphasis added).
• “[Rights] rise, too, from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era.” 576 U.S. at -, 135 S.Ct. at 2602 (emphasis added).
• “[N]ew insights and societal understandings can reveal unjustified inequality- within our most fundamental institutions that once passed unnoticed and unchallenged.” 576 U.S. at -, 135 S.Ct. at 2603 (emphasis added).
• “The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment ... entrusted to future generations a charter protect *568 ing the right of all persons to enjoy liberty as we learn its meaning.” 576 U.S. at -, 135 S.Ct. at 2598 (emphasis added).
An updating of the Constitution based on new insights and better informed societal understandings that are now manifest as we learri its meaning must arise solely from a “solemn and authoritative act” of the people pursuant to Article V, not from judicial innovation based on a “presumption, or even knowledge, of their sentiments.” The Federalist No. 78.

B. The True Meaning of Liberty

The Obergefell majority’s theory of constitutional law also overlooks the reality that the purpose of law is to restrain behavior for the public good.
“[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an ' absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good.”
Jacobson v. Massachusetts, 197 U.S. 11, 26, 25 S.Ct. 358, 49 L.Ed. 643 (1905).
Throughout the majority opinion Justice Kennedy speaks of the “dignity” of marriage and blatantly asserts that “[tjhere is dignity in the bond between two men or two women who seek to marry.” 576 U.S. at -, 135 S.Ct. at 2599. Historically, consummation of a marriage always involved an act of sexual intimacy that was dignified in the eyes of the law. An act of sexual intimacy between two men or two women, by contrast, was considered “an infamous crime against nature” and a “disgrace to human nature.” 4 William Blackstone, Commentaries on the Laws of England *215. Homosexuals who seek the dignity of marriage must first forsake the sexual habits that disqualify them from admission to that hallowed institution. Surely more dignity attaches to participation in a fundamental institution on the terms it prescribes than to an attempt to wrest its definition to serve inordinate lusts that demean its historic dignity. A “disgrace to human nature” cannot be cured by stripping the institution of holy matrimony of its inherent dignity and redefining it to give social approval to behaviors unsuited to its high station. Sodomy has never been and never will be an act by which a marriage can be consummated.
The Declaration of Independence identifies the source of “liberty” under the American system of government:
“We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. — That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.... ”
The Declaration of Independence para. 2 (U.S. 1776).[3] “Liberty,” an unalienable right, is an endowment of the Creator. “The God who gave us life gave us liberty at the same time.... ” Thomas Jefferson, A Summary View of the Rights of British America, at 23 (1774). Government exists to secure that right. Because liberty is a gift of God, it must be exercised in conformity with the laws of nature and of *569 nature’s God. “[T]he natural liberty of mankind ... consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature....” 1 Blackstone, Commentaries *121 (emphasis added).
Liberty in the American system of government is not the right to define one’s own reality in defiance of the Creator. The libertarian creed of unbridled self-definition is capsulized in Justice Kennedy’s oft-quoted statement: “At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life.” Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). But the human being, as a dependent creature, is not at liberty to redefine reality; instead, as the Declaration of Independence states, a human being is bound to recognize that the rights to life, liberty, and the pursuit of happiness are endowed by God. Those rights are not subject to a redefinition that rejects the natural order God has created.
“Man, considered as a creature, must necessarily be subject to the laws of his creator, for he is entirely a dependent being.” 1 Blackstone, Commentaries *39. Part of that natural order is the institution of marriage as the union of a man and a woman. “Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh.” Genesis 2:24. The Obergefell majority’s false definition of marriage arises, in great part, from its false definition of liberty. Separating man from his Creator, the majority plunges the human soul into a wasteland of meaninglessness where every man defines his own anarchic reality. In that godless'world nothing has meaning or consequence except as the human being desires. Man then becomes the creator of his own reality rather than a subject of the Creator of the Declaration. See Romans 1:25 (identifying those “[w]ho changed the truth of God into a lie, and worshipped and served the creature more than the Creator”).
This false notion of liberty, which permeates the majority opinion in Obergefell, is the ultimate fallacy upon which it rests. In a world with God left out, the moral boundaries of Scripture disappear, and man’s corrupt desires are given full rein. The end of this experiment in anarchic liberty is yet to be seen. The great sufferers will be the children — deprived of either a paternal or a maternal presence — who are raised in unnatural families that contradict the created order. A political scientist states: “‘[T]he traditional family, the embodiment and expression of the “laws of nature and of nature’s God,” as the foundation of a free society, has become merely one of many “alternative lifestyles.” ... A free people who succumbs to such a teaching cannot long endure.’ ” Samuel H. Dresner, Can Families Survive in Pagan America? 99 (1995) (quoting Harry V. Jaffa, Homosexuality and the Natural Laiv '38 (1990)). As Thomas Jefferson stated:
“And can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the gift of God? That they are not to be violated but with his wrath? Indeed, I tremble for my country when I reflect that God is just; that his justice cannot sleep forever.... ”
“Notes on the State of Virginia” (1787), in 8 The Writings of Thomas Jefferson 404 (H.A. Washington ed., 1854).

C: Abuse of the Fourteenth Amendment

The invocation of “equal dignity” to justify the invention of a heretofore un *570 known constitutional right is just another judicial mantra to rationalize the invalidation of state laws that offend the policy-preferences of a five-person majority. The notion of “equal dignity,” as this Court recently stated, “is a legal proxy for invalidating laws federal judges do not like, even though no actual constitutional infirmity exists.” Ex parte State ex rel. Alabama Policy Institute 200 So.3d 495, 547 (Ala.2015) (“API”). Justice Black once stated: “There is ... no express constitutional language granting judicial power to invalidate every state law of every kind deemed ‘unreasonable’ or contrary to the Court’s notion of civilized decencies....” Rochin v. California, 342 U.S. 165, 176, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Black, J., concurring). In 1930, in the waning days of his judicial career, Justice Oliver Wendell Holmes expressed his alarm at the elastic qualities the Supreme Court had ascribed to the Fourteenth Amendment to satisfy the Court’s desire to exercise plenary supervision over state legislation: “I cannot believe that the [Fourteenth] Amendment was intended to give us carte blanche to embody our economic or moral beliefs in its prohibitions.” Baldwin v. Missouri, 281 U.S. 586, 595, 50 S.Ct. 436, 74 L.Ed. 1056 (1930) (Holmes, J., dissenting).
As late as 1986, the United States Supreme Court specifically declared:
“There should be, therefore, great resistance to expand the substantive reach of [the Due Process Clauses of the Fifth and Fourteenth Amendments], particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us today falls far short of overcoming this resistance.”
Bowers v. Hardwick, 478 U.S. 186, 195, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), overruled by Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). The “claimed right” of which the Court spoke in Bowers was the “right” to commit sodomy. Although the Court in 1986 adamantly refused to recognize any such right in the United States Constitution, the Lawrence v. Texas opinion did just that 17 years later. Nevertheless, the Supreme Court’s admonition in 1986 that expanding the substantive reach of the Fifth and Fourteenth Amendments to redefine fundamental rights like marriage would give the Court “further authority to govern the country without express constitutional authority,” 478 U.S. at 195, is still true and can clearly be seen in Obergefell.
The “fundamental right” to marriage the Supreme Court has invoked in previous cases always involved the right of a man and a woman to marry. Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), cited as a precedent for constitutional review of state marriage laws by the Obergefell majority, 576 U.S. at -, 135 S.Ct. at 2598-99, did not change this fact, but only removed a x-ace-based barrier to participation in that institution. No one doubts that the Fourteenth Amendment was designed to remove such civil disabilities. Equally indisputable is that the states that l-atified the Fourteenth Amendment in 1868 did not remotely intend to empower the federal courts to redefine marriage to include same-sex marriage.
The majority opinion in Obergefell represents the culmination of a change in our form of government from one of three separate-but-equal branches to one in which the judicial branch now exercises *571 the power of the legislative branch.[4] President George Washington asserted that this “spirit of.encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a. real despotism.” Farewell Address, at 226. And thus by the weapon of judicial usurpation, free government is destroyed.
The Constitution limits the power of the federal government in order to protect the right of the people to govern themselves. See U.S. Const, amends. IX & X.[5] In his criticism of the Court’s invention of a constitutional right to bring contraceptive devices into the marital chamber, Justice Potter Stewart stated:
“If, as I should surely hope, the law before us does not reflect the standards of the people of Connecticut, the people of Connecticut can freely exercise their true Ninth and Tenth Amendment rights to persuade their elected representatives to repeal it. That is the constitutional way to take this law off the books.”
Griswold, 381 U.S. at 531 (Stewart, J., dissenting). The Obergefell majority, presuming to know better than the people themselves how to order the fundamental domestic institution of society, has usurped the legislative prerogatives of the people contrary to the Ninth and Tenth Amendments.

II. The Dissenters’ Critique

The four dissenters in Obergefell convincingly detail the illegitimacy of the majority opinion.

A. Chief Justice Roberts

The Chief Justice describes the pretended judicial acts of the majority as a form of theft. “Five lawyers have ... enacted their own vision of marriage as a matter of constitutional law. Stealing this issue from the people will for many cast a cloud over same-sex marriage_” 576 U.S. at -, 135 S.Ct. at 2612 (emphasis added). He states flatly: “The right [the majority] announces has no basis in the Constitution or this Court’s precedent.” Id. He accuses the majority of “ordering] the transformation of a social institution that has formed the basis of human society for mil-lennia” based on “its desire to remake society according to its own ‘new insight’ into ‘the nature of injustice.’” Id. In short, the majority acts not as a court of law but as a band of 'social revolutionaries. The Chief Justice, amazed at this presumption, exclaims: “Just who do we think we are?” Id.
The Chief Justice underscores the serious consequences of acquiescence to the majority’s assumption of illegitimate power. The majority, he states, “seizes for itself a question the Constitution leaves to the people.” 576 U.S. at —, 135 S.Ct. at 2612, The real issue, he explains, “is about whether, in our democratic republic, that decision [regarding the definition of marriage] should rest with the people acting through their elected representatives, or with five lawyers who happen to hold commissions authorizing them to resolve legal disputes according to law.” Id. He also points out that all previous decisions *572 of the Supreme Court that treated marriage as a fundamental right rested on “the core structure of marriage as the union between a man and a woman.” 576 U.S. at -, 135 S.Ct. at 2614.
“[T]he majority’s approach,” states the Chief Justice, “has no basis in principle or tradition except for the unprincipled tradition of judicial policymaking.” 576 U.S. at -, 135 S.Ct. at 2616. Thus, “the majority’s position [is] indefensible as a matter of constitutional law.” Id. In support of this point, the Chief Justice draws on Justice Benjamin Curtis’s dissent in Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857). Remonstrating against the Dred Scott majority’s novel effort at enforcing a pax judicatus on the slavery issue, Justice Curtis warned that, when the “ ‘fixed rules which govern the interpretation of laws [are] abandoned, and the theoretical opinions of individuals are allowed to control’” the meaning of the Constitution, “ “we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean.’” 576 U.S. at -, 135 S.Ct. at 2617 (quoting Dred Scott, 60 U.S. (19 How.) at 621).
The Chief Justice’s quotation of Justice Curtis’s Dred Scott dissent merits serious consideration. If acquiescence to Oberge-fell indicates that “we have no longer a Constitution,” then the legitimacy of Obergefell is subject to grave doubt. If five Justices of the Supreme Court may at will redefine the Constitution according to their own policy preferences, the mechanism of judicial review, designed originally to protect the rights of the people from runaway legislatures, has morphed into the right of five lawyers to rule the people without their consent.
By employing the Constitution as a license to create social policy for the nation, the Court, states the Chief Justice, becomes “a legislative chamber.” 576 U.S. at -, 135 S.Ct. at 2617 (quoting Learned Hand, The Bill of Rights, The Oliver Wendell Holmes Lectures, 1958 42 (1977)). Are the true legislative bodies of this country obligated to respect such a usurpation of their own prerogatives? The Chief Justice quotes Justice Byron White as follows: “ ‘The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution.’ ” 576 U.S. at -, 135 S.Ct. at 2618 (quoting Moore v. City of East Cleveland, 431 U.S. 494, 544, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (White, J., dissenting)).[6] Such is the reality of the majority opinion in Obergefell.
Other concerns, states Chief Justice Roberts, appear in the wake of the majority’s “freewheeling notion of individual autonomy.” 576 U.S. at -, 135 S.Ct. at 2621. If the opinion reflects no more than “naked policy preferences,” id., with no basis in the Constitution, what is to restrain the Court from inventing other new “liberties” the majority may imagine? The Chief Justice sees nothing in the majority opinion that would be incompatible with the declaration of a constitutional right to polygamy. The majority, he states, “offers no reason at all why the two-person element of the core definition of marriage may be preserved while the man-woman element may not.” 576 U.S. at -, 135 S.Ct. at 2621. Polygamy, he notes, has more of a tradition in the *573 world’s cultures than same-sex marriage. “If the majority is willing to take the big leap, it is hard to see how it can say no to the shorter one.” Id. Indeed, as the Chief Justice warns, the plenary power the majority asserts to redefine the fundamental institutions of society offers no assurance that it will not give birth to yet further attacks on the social order.
The majority ostensibly relies on the Due Process Clause of the Fourteenth Amendment to justify its mandate for an unprecedented social revolution. But, as the Chief Justice states: “The majority’s understanding of due process lays out a tantalizing vision of the future for Members of this Court: If an unvarying social institution enduring over all of recorded history cannot inhibit judicial policymak-ing, what can?” 576 U.S. at -, 135 S.Ct. at 2622. Noting that the majority’s actions are “dangerous for the rule of law,” id., the Chief Justice states that by undermining respect for the Court’s judgments, the majority draws into question the Court’s legitimacy. Decrying “the majority’s extravagant conception of judicial supremacy,” 576 U.S. at -, 135 S.Ct. at 2624, he notes its absence of humility or restraint. “Over and over,” he states, “the majority exalts the role.of the judiciary in delivering social change.” Id.
“Those who founded our country would not recognize the majority’s conception of the judicial role. They after all risked their lives and fortunes for the precious right to govern themselves. They would never have imagined yielding that right on a question of social policy to unaccountable and unelected judges.”

Id.

If, as the Chief Justice demonstrates, a governing majority of the Supreme Court has departed from the vision of the Founders, are the rest of us also required to depart from the founding principles of this republic? Or should we adhere to the principles of representative government— government by the people — and repudiate the judicial majority that orders otherwise? The Chief Justice emphasizes that the majority’s actions have no basis in law: “Neither petitioners nor the majority cites a single case or other legal source providing any basis for such a constitutional right [to same-sex marriage]. None exists. ...” 576 U.S. at -, 135 S.Ct. at 2619. Contemplating the role of the Constitution in the opinion of the majority, he concludes: “It had nothing to do with it.” 576 U.S. at -, 135 S.Ct. at 2626. If, as the Chief Justice asserts, the opinion .of the majority is not based on the Constitution, do state judges have any obligation to obey that ruling? Does not their first duty lie to the Constitution? Otherwise, as Justice Curtis stated in. his Dred Scott dissent, “we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean.” 60 U.S. (19 How.) at 621.

B. Justice Scalia

Justice Scalia, who joined in full the dissent of Chief Justice Roberts, echoes the theme' of a threat’ to our republican form of government. He notes the demise of constitutional government in the ashes of the majority’s opinion razing the institution of marriage. “Today’s decree says that my Ruler, and the Ruler of 320 million Americans coast-to-coast, is a majority of the nine lawyers on. the Supreme Court.” 576 U.S. at -, 135 S.Ct. at 2627. Justice Scalia underscores this point: “This practice of constitutional revision by an unelected committee of nine ... robs the People of the most important liberty they asserted in the Declaration of *574 Independence and won in the Revolution of 1776: the freedom to govern themselves.” 576 U.S. at -, 135 S.Ct. at 2627 (emphasis added).
The opinion of the majority, he further states, “lacks even a thin veneer of law.” 576 U.S. at -, 135 S.Ct. at 2628. Thus, “[t]he naked judicial claim to legislative— indeed, super-legislative — power [is] fundamentally at odds with our system of government,” and “makes the People subordinate to a committee of nine unelected lawyers,” 576 U.S. at -, 135 S.Ct. at 2629. Contending that the majority opinion lacks legal legitimacy, he terms it “a social upheaval,” i.e., a social revolution. Id. The right to change the form of government in this country belongs to the people themselves through the amendment process, not to judicial oligarchs. Justice Scalia describes the majority’s ruling as a “judicial Putsch.” Id. A “putsch” is “a secretly plotted and suddenly executed attempt to overthrow a government.” Merriam-Webster’s Collegiate Dictionary 1013 (11th ed. 2009). The word is most commonly associated with Adolf Hitler’s 1923 attempt to seize power in Germany. Justice Scalia’s use of this term underscores the revolutionary nature of the majority’s presumptive exercise of judicial power to remake the social order.
Justice Scalia concludes that “to allow the policy question of same-sex marriage to be considered and resolved by a select, patrician, highly unrepresentative panel of nine is to violate a principle even more fundamental than no taxation without representation: no social transformation without representation.” 576 U.S. at -, 135 S.Ct. at 2629 (emphasis added). Justice Scalia’s estimation that the majority’s social revolution is a more outrageous abuse of power than the events that immediately triggered the American Revolution is very sobering. The judiciary, he states, “ ‘must ultimately depend upon the aid of the executive arm’ and the States, ‘even for the efficacy of its judgments.’” 576 U.S. at -, 135 S.Ct. at 2631 (quoting The Federalist No. 78, at 522-23 (Alexander Hamilton) (J. Cooke ed., 1961)), He thus intimates that the refusal of the states to recognize the legitimacy of the Obergefell decision, “one that is unabashedly based not on law,” would be a healthy reminder of the Court’s “impotence” in the face of a refusal to acquiesce to its systematic destruction of popular government. 576 U.S. at -, 135 S.Ct. at 2631.[7]

C. Justice Thomas

Justice Thomas adds his analysis to the fusillade of criticism of the majority opinion. He attacks in particular the invocation of the doctrine of “substantive due process” that allows the Court to invent new rights out of the word “liberty” in the Due Process Clause. Like Chief Justice Roberts and Justice Scalia, he sounds the alarm at this rending of the fabric of our country: “By straying from the text of the Constitution, substantive due process exalts judges at the expense of the People from whom they derive their authority.” *575 576 U.S. at -, 135 S.Ct. at 2631. He notes that this expansive and “imaginary” use of the Due Process Clause “wip[es] out with a stroke of the keyboard the results of the political process in over 30 States.” 576 U.S. at -, 135 S.Ct. at 2632 and n. 1. The entitlement to a marriage license with the accompanying government benefits, he notes, is inconsistent with the historic meaning of “liberty” as a “freedom from physical restraint.” 576 U.S. at -, 135 S.Ct. at 2633. Neither the Founders nor the authors of the Fourteenth Amendment considered that the right not to be deprived of liberty without due process of law encompassed a positive entitlement to governmental benefits, “In the American legal tradition, liberty has long been understood as individual freedom from, governmental action, not as a right to a particular governmental entitlement.” 576 U.S. at -, 135 S.Ct. at 2634. Thus, “receiving governmental recognition and benefits has nothing to do with any understanding of ‘liberty’ that the Framers would have recognized.” 576 U.S. at -, 135 S.Ct. at 2636.

D. Justice Alito

Justice Alito notes that the majority’s definition of “liberty” has “a distinctively postmodern meaning” in which “five unelected Justices ... impos[e] their personal vision of liberty upon the American people.” 576 U.S. at -, 135 S.Ct. at 2640. He recognizes that the fundamental purpose of marriage historically has been to provide for the welfare of children and not merely to contribute to the well-being of adults. The rising rate of out-of-wedlock pregnancy has contributed to the decay of marriage by fraying the tie between marriage and procreation.[8] 576 U.S. at -, 135 S.Ct. at 2641. Many states legitimately worry that abandoning the traditional definition “may contribute to marriage’s further decay.” 576 U.S. at -, 135 S.Ct. at 2642. Thus, “[it] is far beyond the outer reaches of this Court’s authority to say that a State may not adhere to the understanding of marriage that has long prevailed ... all around the globe.” Id.
■Justice Alito, like the other dissenters, points out that the majority has created a constitutional right out of thin air:
“‘[T]he Constitution simply- does not speak to the issue of same-sex marriage. In our system of government, ultimate sovereignty rests , with the people, and the people havé the right to control their own destiny. Any change on a question so fundamental should be made by the people through.their elected officials.’”
576 U.S. at -, 135 S.Ct. at 2642 (quoting United States v. Windsor, 570 U.S. —, —, 133 S.Ct. 2675, 2716, 186 L.Ed.2d 808 (2013) (Alito, J., dissenting)). In harmony with his dissenting colleagues, Justice Alito asserts that “[t]oday’s decision usurps the constitutional right of the people to decide whether to keep or alter the traditional understanding of marriage.” 576 U.S. at -, 135 S.Ct. at 2642.
“If a bare majority of Justices can invent a new right and impose that right on the rest of the country, the only real limit on what future majorities will be able to do is their own sense of what those with political power and cultural influence are willing to tolerate....
*576 “Today’s decision shows that decades of attempts to restrain this Court’s abuse of its authority have failed.... What it evidences is the deep and perhaps irremediable corruption of our legal culture’s conception of constitutional interpretation.”
576 U.S. at -, 135 S.Ct. at 2643
E. Summing Up Obergefell: An Unlawful and Illegitimate Decision
The dissenting Justices have accurately described in detail the illegitimacy of the majority’s decision in Obergefell. Their criticisms go far beyond mere disagreement with the philosophical and public-policy arguments upon which the majority opinion relies. Instead, the dissenting Justices employ strong language and vivid metaphors to portray the seriousness of the majority’s bold attack on the foundations of representative government and the collateral damage to religious liberty.
Their language is stirring and forthright:
Chief Justice Roberts portrays the majority as thieves who are “stealing” the marriage issue from the people. Justice Scalia uses a similar metaphor, stating that the majority “robs the People of ... the freedom to govern themselves.” These metaphors identify the essence of the majority’s actions: an illegal displacement and usurpation of the democratic process. Chief justice Roberts accuses the majority of imposing “naked policy preferences” that have “no basis in the Constitution.” Accordingly, the majority’s “extravagant conception of judicial supremacy” is “dangerous for the rule of law.” The unmistakable theme that emerges from these critiques is lawlessness. A body whose reason for being is to apply the law has instead forsaken the law for a lawless imposition of the latest postmodern assault on the natural order. The majority are judges in name only, having in fact forsaken the judicial role to engage in “remaking' society” and transforming— without legal authority — the most fundamental social institution.
Justice Scalia also emphasizes the revolutionary character of the majority’s assault on the social order — elevating the “crime against nature” into the equivalent of holy matrimony.[9] This decision, “unabashedly not based on law,” represents a “social upheaval” and a “judicial Putsch.” Justice Alito sounds the same themes. The Court has not unwittingly tread into forbidden territory; instead, it has acted “far beyond the outer reaches” of its authority, boldly trampling the right of the people “to control their own destiny.”
III. The Precursors to Obergefell
For the last 50 years, the Supreme Court has consistently misused the Fourteenth Amendment to destroy state laws that pi-otect the marital relation and its offspring. Obergefell is the latest fruit of this corrupt tree. Matthew 7:17-18.
In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court found in “penumbras, formed by emanations” from the “specific guarantees in .the Bill of Rights,” a right of “privacy” for married couples to use contraceptives. Id. at 484. That opinion, explained a dissenter, “prevents state legislatures from passing any law deemed by this Court to interfere with ‘privacy.’ ” Id. at 510 n. 1 (Black, J. dissenting). By holding unconstitutional a law that was not forbidden by *577 a specific provision of the Constitution, the Court quietly assumed the power to negate any state legislation of which it disapproved. As Justice Black stated:
“[N]o provision of the Constitution ... either expressly or impliedly vests power in this Court to sit as a supervisory agency over acts of duly constituted legislative bodies and set aside their laws because of the Court’s belief that the legislative policies adopted are unreasonable, unwise, arbitrary, capricious or irrational. The adoption of such a loose, flexible, uncontrolled standard for holding laws unconstitutional, if ever it is finally achieved, will amount to a great unconstitutional shift of power to the courts which I believe and am constrained to say will be bad for the courts and worse for the country. Subjecting federal and state laws to such an unrestrained and unrestrainable judicial control as to the wisdom of legislative enactments would, I fear, jeopardize the separation of governmental powers that the Framers set up and at the same time threaten to take away much of the power of States to govern themselves which the Constitution plainly intended them to have.”
381 U.S. at 520-21 (Black, J., dissenting) (emphasis added).
Speaking 50 years before the issuance of the majority opinion in Obergefell, Justice Black presciently anticipated its reasoning:
“I realize that many good and able men have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court- is charged with a duty to make those changes.”
381 U.S. at 522.[10] , Assuredly, Justice Black would not have agreed with Justice Kennedy’s grandiloquent “nature-of-injustice” passage and his invocation of the right of the Court to draw limitless new rights out of the bottomless depths of the Due Process Clause “as we learn its meaning.” [11] Truly, the less basis the majority has for its innovations upon the Constitution, the grander is the language employed to justify them, as if high-blown rhetoric could compensate for the absence of constitutional substance.
Griswold was the first car on the illicit and unconstitutional train that led from contraception to abortion and then on to sodomy and same-sex marriage. In 1972, the Court extended the penumbral right of contraception to the unmarried, deconstructing the union of husband and wife that infused Griswold into merely “an association of two individuals.” Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). “If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.” 405 U.S. at 453. Venturing beyond “the sacred precincts of marital bedrooms,” Griswold, 381 U.S. at 485, the Court anointed with constitutional protection the use of contraceptive devices *578 by the unmarried, setting its seal of approval upon fornication. And if anyone found .the extension of Griswold to the unmarried to be less than convincing, the Court had ready at hand an additional rationale: Allowing the use of such devices by the marriód, but not the unmarried, violated the Equal Protection Clause. The married and the unmarried; the Court amazingly held, were “similarly situated” in regard to contraceptive use. Thus, “the State could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons.” Eisenstadt, 405 U.S. at 454. See John Hart Ely, The Wages of Crying Wolf, A Comment on Roe v. Wade, 82 Yale L.J. 920, 929 n. 68 (1973) (commenting on “the Eisenstadt Court’s obviously strained performance respecting the Equal Protection Clause”).[12]
Chief Justice Warren Burger dissented. Seeing nothing in the Fourteenth Amendment that prohibited a state from regulating the distribution of contraceptives, he noted that the Court had “seriously invade[d] the constitutional prerogatives of the States” and “passed beyond the penumbras of the specific guarantees into the uncircumscribed area of personal predilections.” 405 U.S. at 467, 472 (Burger, C.J., dissenting).
In Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Court took a further step down the road of immorality by crowning with constitutional dignity not only the general provision of contracep-fives to minors but also the requirement that they be available over the counter. Thus saith the Due Process Clause. Justice William Rehnquist mused on the likely reaction of those who fought the Revolutionary War to establish the Bill of Rights and the Civil War to enact the Fourteenth Amendment:
“If those responsible for these Amendments, by feats of valor or efforts of draftsmanship, could have lived to know that their efforts had enshrined in the Constitution the right of commercial vendors of contraceptives to peddle them to unmarried minors through such means as window displays and vending machines located in the men’s room of truck stops, notwithstanding the considered judgment of the New York Legislature to the contrary, it is not difficult to imagine their reaction.”
431 U.S. at 717 (Rehnquist, J., dissenting). Declining to engage in detailed analysis of the majority’s patently “indefensible result,” Justice Rehnquist explained that “no logic chopping can possibly make the fallacy of the result more obvious.” 431 U.S. at 718.
Having served the sexual revolution in the area of contraception, the Court then made constitutional the taking of the life of an unborn child. In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), as it did in Griswold and Eisenstadt, and later in Carey, the Court tackled the difficulty of rationalizing the creation of a new constitutional right that had no colorable *579 basis in the Constitution. The Court ultimately asserted that the right to privacy, “whether it be founded in the Fourteenth Amendment’s concept of personal liberty ... or ... in the Ninth Amendment’s reservation of rights to' the people, is broad enough to encompass a woman’s decision whether or not to terminate her pregnancy.” Roe, 410 U.S. at 153.
Justice Stewart, concurring, 410 U.S. at 167-71, suggested abandoning the effort to cobble together “right-of-privacy” emanations from the Bill of Rights and instead urged sole reliance on the word “liberty” in the Due Process Clause, an infinitely malleable term that has enabled the Court to generate custom-designed constitutional rights. Justice Rehnquist in dissent stated that Roe “partakes more of judicial legislation than it does of a determination of the intent of the drafters of the Fourteenth Amendment.” 410 U.S. at 174, 93 S.Ct. 705. “To reach its result,” he added, “the Court necessarily has had to find within the scope of the Fourteenth Amendment a right that was apparently completely unknown to the drafters of the Amendment.” Id. Justice White, writing in the companion case to Roe, agreed: “I find nothing in the language or history of the Constitution to support the Court’s judgment.” Doe v. Bolton, 410 U.S. 179, 221, 93 S.Ct. 762, 36 L.Ed.2d 147 (1973) (White, J., dissenting). As one commentator observed: “What is frightening about Roe is that this super-protected right is not inferable from the language of the Constitution,” Ely, Wages, at 935, and “is not constitutional law and gives almost no sense of an obligation to try to be.” Id. at 947.
Obergefell is but the latest example of the Court’s creation of constitutional rights out of thin air in service of the immorality of the sexual revolution. Like Roe, Obergefell is no more than “an exercise of raw judicial power ... an improvident and extravagant exercise of the power of judicial review that the Constitution extends to this Court.” Doe, 410 U.S. at 222 (White, J., dissenting).
The incorporation of the sexual revolution into the Constitution continued in Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), which used the Fourteenth Amendment to find, a right to commit sodomy that the high court had specifically rejected only 17 years earlier in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Citing as “authority” Griswold, Eisenstadt, Roe, and Carey — a gallery of constitutional absurdities — the Court stated that, “our laws and traditions in the past half century” “show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex.” Lawrence, 539 U.S. at 571-72.[13] Thus, the Court relied on a series of malformed decisions to justify yet another bizarre departure from moral sanity — and all in defiance of the right of the people to govern themselves.
In language similar to that used in Obergefell, Justice Kennedy, the author of the majority opinion in Lawrence, stated:
*580 “Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty-in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.”
Lawrence, 539 U.S. at 578-79. Justice Kennedy unfortunately omitted the key consideration highlighted by Justice Black in His Griswdid dissent: Amendments to the Constitution are the business of the people pursuant to Article V; they are not the business of the Court under Article III. Truth may not always be clearly seen, but the majority’s reasoning should not blind us to the reality that the Court seems determined to alter this nation’s organic law.
Justice Scalia, dissenting in Lawrence, criticized the Court’s discovery, of yet another sexual-freedom right in the Constitution: “What Texas has chosen to do is well within the range of traditional democratic action, and its hand should not be stayed through the invention of a brand-new ‘constitutional right’ by a Court that is impatient of democratic change.” 539 U.S. at 603 (Scalia, J., dissenting). He also exposed the fallacy in Justice Kennedy’s “search-for-greater freedom” passage:
“It is indeed true that ‘later generations can see that laws once thought necessary and proper in fact serve only to oppress’ ...; and when that happens, later generations can repeal those laws. But it is the premise of our system that those judgments are to be made by the 'people, and not imposed by a governing caste that knows best.”
539 U.S. at 603-04 (emphasis added).
The Obergefell case is but the latest in “a history of repeated injuries and usurpa-tions.” Declaration of Independence para. 2. Among the “long train of abuses and usurpations” cited in the Declaration of Independence was Parliament “declaring themselves invested with power to legislate for us in all cases whatsoever.” Id. Obergefell is the culmination, beginning with Griswold in 1965, of 50 years of judicial usurpation of the right of the people to govern themselves and, in particular, of the states to protect from attack “the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony.” Murphy v. Ramsey, 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 (1885).

TV. The Unavoidable Collision with Religious Liberty

Religious liberty is the gift of God. The Virginia Act for Establishing Religious Freedom (1786), authored by Thomas Jefferson and considered one of his more notable achievements, begins:
“Whereas Almighty God hath created the mind free; that all attempts to influence it by temporal punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the Holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do.... ”
12 William Waller Hening, The Statutes at Large, Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 84 (Richmond 1823) (“12 Hening, Statutes”). The *581 Virginia Act then explains that to allow a “civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous fallacy, which at once destroys all religious liberty.” 12 Hening, Statutes, at 85 (emphasis added).
The definition of marriage as the union of one man and one woman has existed for millennia and has never been considered an “ill tendency.” By contrast, the Court’s attempt to redefine marriage is “a dangerous fallacy which at once destroys all religious liberty” As Justice Thomas explained in his dissent in Obergefell: “The Court’s decision today is at odds not only with the Constitution but with the principles upon which our Nation was built,” 576 U.S. at -, 135 S.Ct. at 2631. Further, “the majority’s decision threatens the religious liberty our Nation has long sought to protect.” 576 U.S. at -, 135 S.Ct. at 2638.
In former times, the Court showed greater respect for God’s gift of religious freedom and deliberated more seriously on the subject. Upholding the denial of an application for citizenship based on conscientious objection to military service, Justice George Sutherland, writing for the Court, stated: “We are a Christian people according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God.” United States v. Macintosh, 283 U.S. 605, 625, 51 S.Ct. 570, 75 L.Ed. 1302 (1931). In a dissent joined by three of his brethren, Chief Justice Charles Evans Hughes noted that the oath to uphold the Constitution administered to legislators and “all executive and judicial Officers,” U.S. Const., art. VI, ¶ 3, was similar to the naturalization oath. Yet the constitutional oath had not been regarded “as requiring one to promise to put allegiance to temporal power above what is sincerely believed to be one’s duty of obedience to God.” Macintosh, 283 U.S. at 630 (Hughes, C.J., dissenting).
Chief Justice Hughes recognized the serious issues presented when governmental power clashes with individual conscience:
“[W]ith many of our worthy citizens it would be a most heart-searching question if they were asked whether they would promise to obey a law believed to be in conflict with religious duty. Many of their most honored exemplars in the past have been willing to suffer imprisonment or even death rather than to make such a promise.”
283 U.S. at 631. Chief Justice Hughes further explained:
“The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation .... One cannot speak of religious liberty, with proper appreciation of its essential and historic significance, without assuming the'existence of a belief in supreme allegiance to the will of God.”
Macintosh, 283 U.S. at 633-34. The Obergefell majority, conspicuously overlooking the “essential and historic significance” of the connection between religious liberty and “supreme allegiance to the will of God,” failed to appreciate the seriousness of imposing a new sexual-revolution mandate that requires Alabama public officials to disobey the will of God.
Fifteen years after Macintosh was decided, the Court adopted the reasoning of Chief Justice Hughes in his Macintosh dissent. Justice William O. Douglas, writing for the Court, stated:
“The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the ages, men have suffered *582 death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle.” .
Girouard v. United States, 328 U.S. 61, 68, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). The Obergefell majority gives scant consideration to these concerns, even though they were presented by amici curiae. See, e.g., brief of amicus curiae Agudath Israel of America, at 17 (“The recognition of same-sex marriage poses a threat to the liberty of religious, organizations and individuals whose faith prevents them from acting in accordance with that recognition.”); brief of amici curiae the General Conference of Seventh-Day Adventists and the Becket Fund for Religious Liberty, at 36 (stating that “adopting same-sex marriage will have significant negative effects on the ability of religious conscientious objectors to participate fully in society”).
In the following passage the Obergefell majority vainly attempts to deflect attention from its egregious assault on religious liberty:
“Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment insures that religious organizations and persons are given propter protection as they seek to teach the principles that are so fulfilling and so centi’al to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.”
576 U.S. at -, 135 S.Ct. at 2607 (emphasis added). Religious liberty, however, is about more than just “teaching” and “advocating” views of marriage. The majority condescendingly approves religious speech against same-sex marriage but not religious practice in conformity with those beliefs. As Chief Justice Roberts states in his dissent: “The First Amendment guarantees ... the freedom to ‘exercise’ religion. Ominously, this is not a word the majority uses.” 576 U.S. at -, 135 S.Ct. at 2625. Justice Thomas similarly notes that religious liberty “is about freedom of action in matters of religion generally,” not merely a right to speak and teach. 576 U.S. at -, 135 S.Ct. at 2638.
The seemingly unnecessary affirmation of a right to speak and teach one’s faith conceals an unstated implication that such speech is to have no practical effect on public policy. As Justice Alito comments: “I assume that those who cling to old beliefs will be able to whisper their thoughts in the recesses of their homes, but if they repeat those views in public, they will risk being labeled as bigots and treated as such by governments, employers, and schools." 576 U.S. at -, 135 S.Ct. at 2642-43. Chief Justice Roberts states:
“Hard questions arise when people of faith exercise religion in ways that may be seen to conflict with the new right to same-sex marriage — when, for example, a religious college provides married student housing only to opposite-sex married couples, or a religious adoption agency declines to place children with same-sex married couples_ Unfortunately, people of faith can take no comfort in the treatment they receive from the majority today.”
576 U.S. at -, 135 S.Ct. at 2625-26. Justice Alito concludes: “By imposing its own views on the entire country, the majority facilitates the marginalization of the many Americans who have traditional ideas.” 576 U.S. at -, 135 S.Ct. at 2643.
*583 Significantly, Obergefell is a more serious threat to religious liberty than the contraception and abortion decisions. .Although Roe granted the mother immunity from prosecution for hiring an abortionist to kill her unborn child, Roe did not compel any medical professional, who conscientiously opposed the practice, to participate in an abortion. In 1973, in the wake of Roe, Congress passed the Church Amendments, which protect individuals and entities who receive certain federal funding from participating in abortion or sterilization procedures contrary to their “religious beliefs or moral convictions.” 42 U.S.C. § 300a-7. Subsequent federal laws confirmed or expanded this protection. See Jody Feder, Cong. Research Serv., RS21428, The History and Effect of Abortion Conscience Laws (2005). Most states have adopted similar conscience-clause legislation. “[Forty-five] states allow some health care providers to refuse to provide abortion services.” Guttmacher Institute, State Policies in Brief: Refusing to Provide Health Services (July 1, 2015).[14]
Obergefell promises to breach the legal protections that have shielded believers from participating in acts hostile to . their faith. As Chief Justice Roberts points out, the Obergefell majority piously declaims that people of faith may believe what they want and seek to persuade others, but it says nary a word about them practicing or exercising their faith as the Free Exercise Clause provides. A leading scholar of the Religion Clause states: “A right to believe a religion, but no right to act on its teachings, would be a hollow right indeed. Belief without practice was the conception of religious liberty that Oliver Cromwell offered to the Catholics of Ireland.” Douglas Laycock, Religious Liberty and the Culture Wars, 2014 U. Ill. L.Rev. 839, 841 (2014). Cromwell stated that he would “ ‘meddle not with any man’s conscience,’ ” but that Catholics would not .be permitted to say the mass. Id. at 841 n. 3 (quoting Christopher Hill, God’s Englishmen: Oliver Cromwell and the English Revolution 121 (1970)).
Because the issuance of marriage licenses is a state function, the individuals in this State whose conscience rights are implicated by Obergefell and any implementing orders are the probate judges and their staffs. The “must issue” order of the federal district court in Mobile potentially requires those probate judges who conscientiously object to issuing faux marriage licenses to violate their consciences or suffer civil penalties of fines and contempt. See Strawser v. Strange, 105 F.Supp.3d 1323 (S.D.Ala.2015). Justice Thomas in his dissent spoke of these looming enforcement measures as “civil restraints” with “potentially ruinous consequences.” 576 U.S. at -, 135 S.Ct. at 2638-39. In his “Emergency Petition . for Declaratory Judgment and/or Protective Order,” Probate Judge Nick Williams echoed that concern, stating: “This Court must act to prevent the imprisonment and .financial ruin of this state’s probate judges who maintain fidelity to their oath of office and their faith.”
Probate Judge John E. Enslen, realigned as a relator, adopted in full Judge Williams’s emergency filing and requested from this .Court a forthright statement that Obergefell will not be allowed to impair his First Amendment rights under the Free Exercise Clause. He stated:
“I, the undersigned, possess the following sincere religious beliefs which I hold sacred. I seek from this Court a *584 pronouncement of the full range of available legal protections for my First Amendment Rights relating to my following sincerely held religious beliefs:
“I believe that marriage was created by the Divine Creator of all mankind to be the sanctuary for the procreative act, regardless of whether or not said act results in the birth of children.
“I believe that our Divine Creator, by revelations to his chosen prophets throughout the ages, has instructed and commanded mankind, who are his spiritual offspring, to abstain from procreative activities and pseudo-procreative activities of any type outside of the bounds of a natural marriage between a man and a woman. I believe that the complementary anatomy of the male and female body is a tactical revelation of that truth from our Divine Creator.
“I believe that authentic marriage is a natural child-creating and natural child-rearing institution. I believe that as an institution, marriage should not be, and never has been, about satisfying the emotional needs of adults, and that marriage should not be reduced to a mere symbol of social inclusion. •
“I believe that over time the adverse ramifications and consequences of ignoring the foregoing Divine mandate will be irreversibly profound. I believe that children are this nation’s most important asset, and that our laws should foster the ideal family life where biological parents rear their children, and our laws should make exceptions only where absolutely necessary due to unavoidable circumstances.
“I believe that homosexuality is not an immutable physical or biological character trait disconnected from one’s moral agency or ability to choose one’s course of personal conduct and behavior.
“I respectfully request this court to uphold my First Amendment Rights and thereby protect me from diversified litigious attacks against my rights to believe, teach, practice, share, and live my sincere religious beliefs, both in the public square and elsewhere. Unlike the new' right of sodomy-based marriage, those First Amendment Rights were foundational to the original establishment of this nation, indeed conditional to the original establishment of this nation, and have priority over other rights newly created by federal judicial fiat.”
As Judge Enslen explains, the Free Exercise Clause, an express constitutional provision, logically takes precedence over a pretended constitutional right formulated from whole cloth by “five lawyers,” as Chief Justice Roberts termed them, Obergefell, 576 U.S. at -, 135 S.Ct. at 2612, 2624 (Roberts, C.J., dissenting), who have embarked on an unauthorized frolic in the field of public policy.
The Virginia Act for Establishing Religious Freedom further explained:
“[T]he proscribing any citizen as unworthy the public confidence by laying upon him an incapacity of being called to offices of trust and emolument, unless he profess or renounce this or that religious opinion, is depriving him injuriously of those privileges and advantages to which in common with his' fellow-citizens he has a natural right.... ”
12 Hening, Statutes, at 85. If the natural tendency of Obergefell is to mandate that no citizen with religious scruples against same-sex marriage can hold the office of probate judge in Alabama, then that citizen has been deprived of “those privileges and advantages to which in common with his fellow-citizens he has a natural right.”
After the ruling in Obergefell was announced, the entire staff of a Tennessee County Clerk’s Office resigned to avoid *585 violating their Christian convictions. A county clerk in Mississippi likewise resigned rather than issue marriage licenses to same-sex couples. Nicole Hensley, Entire Tennessee County Clerk Staff Resigns over Supreme Court’s Gay Marriage Decision, N.Y. Daily News, July 4, 2015.[15] Here in Alabama some probate judges stopped issuing all marriage licenses. In Kentucky a county clerk, who decided in the wake of Obergefell to cease issuing all marriage licenses, was ordered by a federal district judge to issue marriage licenses to same-sex couples in violation of her religious principles. Miller v. Davis, 123 F.Supp.3d 924 (E.D.Ky.2015). A chaplain at a Kentucky Juvenile Detention Center, after 12 years of ministering to juveniles, was banned from the facility because he would not agree to abide by a regulation that prohibits mentioning that homosexuality is a sin. Todd Starnes, The Christian Purge has Begun: Chaplains Banned from Preaching that Homosexuality is a Sin, FoxNews.com, Aug. 11, 2015.[16]
As James Madison stated in 1785:
“[I]t is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of Citizens, and one of the noblest characteristics of the late Revolution. The free men of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle.”
“A Memorial and Remonstrance,” in 1 Letters and Other Writings of James Madison 163 (1865) (“Letters and Writings”). Joining a decision to repudiate the Fugitive Slave Act, Justice. Abram Smith of the Wisconsin Supreme Court expressed similar sentiments: “It is much safer to resist unauthorized and unconstitutional power, at its very commencement, when it can be done by constitutional means, than to wait until the evil is so deeply and firmly rooted that the only remedy is. revolution.” In re Booth, 3 Wis. 157, 201 n. a1 (1854) (Smith, J., concurring), rev’d sub nom. Ableman v. Booth, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1858).[17]
Foreseeing the dire consequences for religious freedom in the principle that same-sex marriage must be given equal stature with holy matrimony and foreseeing the inevitable pressure to compel religious institutions, businesses, and practitioners of professions to conform to that unreality, it would be imprudent to wait for the onset of these persecutions, to stand idle until Obergefell’s “usurped power had strengthened itself by exercise, and entangled the question in precedents.” Rather “the axe [must be] laid unto the root of the trees,” Matthew 3:10, and the consequence avoided by denying the principle. To allow a simple majority of the United States Supreme Court to “create” a constitutional right that destroys the religious liberty guaranteed by the First Amendment- violates not only common *586 sense but also our duty to the Constitution.

V. The Supreme Law of the Land

Less than two weeks after Obergefell was released, the Louisiana Supreme Court relied on it to determine that the Louisiana law defining marriage as the union of a man and a woman could no longer be enforced. Costanza v. Caldwell, 167 So.3d 619 (La.2015). The Louisiana court stated that United States Supreme Court opinions “ ‘must be obeyed in order to maintain the law in its majesty of final decision.’” Id. at 621 (quoting State v. Nichols, 216 La. 622, 633, 44 So.2d 318, 321 (1950)). One Justice concurred but only because “I am constrained to follow the rule of law set forth by a majority of the nine lawyers appointed to the United States Supreme Court.” 167 So.3d at 622 (Knoll, J., additionally concurring) (emphasis added). That Justice vigorously expressed her disagreement:
“This is not a constitutionally-mandated decision, but a super-legislative imposition of the majority’s will over the solemn expression of the people evidenced in their state constitutional definitions of marriage.
“Moreover, the five unelected judges’ declaration that the right to marry whomever one chooses is a fundamental right is a mockery of those rights explicitly enumerated in our Bill of Rights. Simply stated, it is a legal fiction imposed upon the entirety of this nation because these five people think it should be....
“It is a sad day in America when five lawyers beholden to none and appointed for life can rob the people of their democratic process.... I wholeheartedly disagree and find that, rather than a triumph of constitutionalism, the opinion of these five lawyers is an utter travesty as is my constrained adherence to their law of the land ’ enacted not by the will of the American people but by five judicial activists.”
Id. (emphasis added).
I appreciate this Justice’s critique of Obergefell, which parallels those of its four dissenters. Although this critique is devastating, I disagree with the conclusion that the “rule of law” requires judges to follow as the “law of the land” a precedent that is “a super-legislative imposition,” “a mockery,” “a legal fiction,” and “an utter travesty.”[18]

A. Do Supreme Court Decisions Automatically Become the “Law of the Land”?

Does an opinion of the United States Supreme Court, like Obergefell, which blatantly affronts the Constitution, automatically become the “rule of law” and the “law of the land?” Sir William Blackstone’s Commentaries on the Laws of England became the “manual of almost every student of law in the United States”[19] during this nation’s formative years. Blackstone stated that “the law, and the opinion of the judge are not always convertible terms, or one and the same thing; since it sometimes may happen that the judge may mistake the law.” 1 Commentaries *71. Blackstone understood that judges may *587 make mistakes, but in Obergefell, according to the forceful dissents, the majority did not merely make a mistake of law, but instead judged not by the law, but by their own will. As Alexander Hamilton stated: “[I]f [the courts] should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body.” The Federalist No. 78, at 526.
Article VI, ¶2, of the United States Constitution defines “the supreme law of the land.”
“This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the. supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or -the Laws of any State to the Contrary notwithstanding.”
By the plain language of Article VI, state judges áre bound to obedience to the Constitution, laws made in pursuance thereof, and treaties made under the authority of the-United States,'«oí to the opinions of the United States Supreme Court.[20] Justice Joseph Story stated: “In the ordinary use of language it will hardly be contended that the decisions of. Courts constitute laws. They are, at most, only evidence of what the laws are; and are not of themselves laws.” Swift v. Tyson, 41 U.S. (16 Pet.) 1, 18, 10 L.Ed. 865 (1842), overruled by Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
Alexander Hamilton, surely an authority on the Constitution, responding to arguments that the Supremacy Clause would allow the new national government to trample on the rights of the states, put the matter very plainly: “If a number of political societies enter into a larger political society” he wrote, “the laws which the latter may enact, pursuant to the powers intrusted to it by its constitution, must necessarily be supreme over those societies, and the individuals of whom they are composed.” The Federalist.No. 83, at 207 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis added). But if those powers were abused, the corresponding laws were not supreme,
“But it will not follow from this doctrine that acts of the large society which are not pursuant to its constitutional powers but. which are invasions of the residuary authorities of the smaller societies will become the supreme law of the land. These will be merely acts of usurpation and will deserve to be treated as such.”
Id. Hamilton emphasized: “It will not, I presume, have escaped observation, that [the Supremacy Clause] expressly confines this supremacy to laws made pursuant to the constitution....” Id. Thus, in the plainest terms and employing emphasis, Hamilton declared that acts of the federal government that invade the reserved rights of the states are “acts of usurpation” that deserve to be treated as such. Such acts “would not be the supreme law of the land, but an usurpation of power not granted by the Constitution.” The Federalist No. 83, at 208.
The Supremacy Clause, quite obviously, by this chain of reasoning, does not give the United States Supreme Court or any other agency of-the federal government the authority to make its every declaration by that very fact the supreme law of the *588 land. If the Court’s edicts do not arise from powers delegated to the federal government in the Constitution, they are to be treated not as the supreme law of the land but as mere usurpation. Hamilton offered an example of an invasion of the reserved powers of the states that is very close to the pretense of authority set forth in the opinion of the Obergefell majority.
“Suppose by some forced constructions of its authority (which indeed cannot easily be imagined) the Federal Legislature should attempt to vary the law of descent in any State; would it not be evident that in making such an attempt it had exceeded its jurisdiction and infringed upon that of the State?”
The Federalist No. 33, at 206. The laws of inheritance are inseparable from those laws that define the family and in particular the marital relationship. Writing in 1788, over two centuries before Obergefell, Hamilton understandably could not easily imagine the “forced constructions” of federal authority in that case that altered the very definition of marriage. But his example from the law of descent, intended to illustrate an absurdity, makes it clear that Obergefell is an act of usurpation that “will deserve to be treated as such.”
Nevertheless, so as not to be misunderstood, I emphasize that judges are ordinarily obligated to regard the opinions of the high court as valid precedent that should be followed. Blackstone eloquently stated the general rule that judges are to follow precedent:
“For it is an established rule to abide by former precedents, where the same points come again in litigation: as well to keep the scale of justice even and steady, and not liable to waver with every new judge’s opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, has now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments: he being sworn to determine not according to his own private judgments, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.”
1 Commentaries *69. But he also stated a vital exception to that rule.
“Yet this rule admits of exception, where the former determination is most evidently contrary to reason; much more if it be contrary to the divine law. But even in such cases the subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation. For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was bad law, but that it was not law....”
Id. *69-70 (some emphasis added). Thus, if precedents are “manifestly absurd or unjust,” “contrary to reason,” or “contrary to the divine law,” they are not to be followed.
Applying Blackstone’s analysis, which is compatible with that of Hamilton, one must conclude that the Obergefell opinion is manifestly absurd and unjust, as demonstrated convincingly by the four dissenting Justices in Obergefell and the writings of two Justices of the Louisiana Supreme Court in Costanza. Basing its opinion upon a supposed fundamental right that has no history or tradition in our country,[21] the opinion of the Obergefell majority is *589 “contrary to reason” as well as “contrary to the divine law.” See Murphy v. Ramsey, 114 U.S. at 45 (defining “the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony” (emphasis added)); Smith v. Smith, 141 Ala. 590, 592, 37 So. 638, 638 (1904) (describing marriage as a “sacred relation”); Goodrich v. Goodrich, 44 Ala. 670, 675 (1870) (quoting a treatise for the proposition that “ ‘ “[t]he relation of marriage is founded on the will of God, and the nature of man” ’ ” (quoted in API, 200 So.3d at 507)).[22] The Obergefell opinion, being manifestly absurd and unjust and contrary to reason and divine law, is not entitled to precedential value.

B. The Military Analogy: The Duty to Disregard Illegal Orders

I took my first oath to support the Constitution of the United States in 1965 at the United States Military Academy on the banks of the Hudson River at West Point, New York. On this very site General George Washington defended the northwest territory against British invasion during the Revolutionary War. I repeated that oath many times during my military service in Western Europe, Vietnam, and locations in the continental United States. Following my military service and upon graduation from the University of Alabama School of Law, I again took an oath to “uphold and support” the United States Constitution. As a private practitioner, deputy district attorney, circuit judge, and Chief Justice of the Alabama Supreme Court on two separate occasions, I took that oath and have administered it to other Judges, Justices, Governors, and State and local officials. In both civilian and military life the oath of loyalty to the Constitution is of paramount importance.'
Although the United States military depends for its effectiveness on obedience to the chain of command, the principle that a subordínate has a duty to resist illegal orders is also well established. The duty to obey the orders of a superior is absolute “unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful.” United States Manual for Courts-Martial, Part II Rules for Courts-Martial, Chapter IX, Rule 916(d) (“Obedience to orders”). The oath I took as a cadet at the United States Military Academy at West Point stated, in part, “that I will at all times obey the legal orders of my superior officers, and the Uniform Code of Military Justice.” 57 Bugle Notes, at 5 (1965) (emphasis added). Later, as a company commander in Vietnam, I knew the importance of following orders. The success or failure of a mission and the lives of others depended on strict adherence to the chain of command. The principle of obedience to superior orders is also crucial to the proper functioning of a court system. Nevertheless, the principle of obedience to superior officers is based on the premise that the order given is a lawful one.
At his court-martial, Lt. William Calley, a unit commander at My Lai in Vietnam who was convicted of killing 22 innocent civilians, defended himself by claiming that he was following the orders of his superior, Captain Ernest Medina. The military tribunal that considered Lt. Galley’s appeal rejected his superior-order defense on the ground that the order he claimed to be following was clearly unlawful. Even if Lt. Calley had acted in obedience to or *590 ders, “he would nevertheless not automatically be entitled to acquittal. Not every order is exonerating.” United States v. Calley, 46 C.M.R. 1131, 1183 (1973). “Military effectiveness depends upon obedience ,to.orders. On the other hand the obedience of a■ soldier is not the obedience of an automaton. A soldier is a reasoning agent, obliged to respond, not as a machine, but as a person.” United States v. Calley, 48 C.M.R. 19, 26 (1973) (emphasis added).
“‘[T]he only exceptions recognized to the rule of obedience are cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness ....
“ ‘Except in such instances of palpable illegality, which must be of rare occurrence, the-inferior should presume that the order was lawful and authorized and obey it accordingly....”’
Calley, 48 C.M.R. at 28 (quoting William Winthrop, Military Law and Precedents 296-97 (2d ed. 1920 Reprint) (emphasis added)).
The same principle, engraved on a plaque at Constitution ' Corner at West Point, states: “Our American Code of Military Obedience requires that, should orders and the law ever conflict, our officers must obey the law. Many other nations have adopted our principle of loyalty to the basic law.” Lt. Calley’s conviction confirmed that the basic law remained intact. The same plaque in Constitution Corner reiterates this point even more emphatically: “The United States boldly broke with the ancient military custom of swearing loyalty to a leader. Article VI required that American Officers thereafter swear loyalty to our-basic law, the Constitution.”
Over 150 years ago, Justice Abram Smith of the Wisconsin Supreme Court, addressing the Fugitive Slave Act, 9 Stat. 462, expressed the same sentiment. Acknowledging his oath of loyalty under Article VI to uphold the Constitution, Justice Smith stated that “the duty of the [states] to watch closely and resist firmly every encroachment of the [federal government] becomes every day more and more imperative, and the official oath of the functionaries of the states becomes more and more significant.” In re Booth, 3 Wis. 1, 24 (Smith, J.). Justice Smith recognized that state judges have a duty to resist unconstitutional federal usurpations of power:
“But believing as I do, that every state officer who is required to take an oath to support the Constitution of the United States as well as of his own state, was designedly placed by the federal constitution itself as a sentinel to guard the outposts as well as the citadel of the great principles and rights which it was intended to declare, secure and perpetuate, I cannot shrink from the discharge of the duty now devolved upon me. I know well its consequences, and appreciate fully the criticism to which I may be subjected. But I believe most sincerely and solemnly that the last hope of free, representative and responsible government rests upon the state sovereignties and fidelity of state officers to their double allegiance, to the state and federal government; and so believing, I-cannot hesitate in performing a clear,, an indispensable duty.”
In re Booth, 3 Wis. at 22-23. President Andrew Jackson made the same point: “Each public officer who takes an oath to support thé Constitution swears that he will support it as he understands it, and not as it is understood by others.” “Veto Message, July 10, 1832,” 3 A Compilation of the Messages & Papers of the Presidents 1145 (James D. Richardson ed., 1897).
*591 If, as an individual who is sworn to uphold and support the United States Constitution, I were to place a court opinion that manifestly and palpably violates the United States Constitution above my loyalty to that Constitution, I would betray my oath and blatantly disregard the Constitution I am sworn to uphold. Acquiescence on my part to acts of "palpable illegality” would be an admission that we are governed by the rule of man and not by the rule of law. Simply put, the Justices of the Supreme Court, like every American soldier, are under the Constitution, not above it. James Madison warned that “the judicial department, also, may exercise or sanction dangerous powers beyond the grant of the Constitution.” Madison’s Report on the Virginia Resolutions, in 4 Debates in the Several State Conventions on the Adoption of the Federal Constitution 549 (Jonathan Elliot ed., 1836) (hereinafter “Élliot’s Debates”). As Chief Justice John Marshall explained in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 179-80, 2 L.Ed. 60 (1803): “[T]he framers of the constitution contemplated that instrument, as a rule for the government of courts, as well as of the legislature. Why otherwise does it direct the judges to take an oath to support it?” One scholar plainly states: “The courts are constitutional agents, and as such occupy an inferior position to the Constitution itself.” Edward J. Erler, Solving the Wind: Judicial Oligarchy and the Legacy of Brown v. Board of Education, 8 Harv. J.L. & Pub. Pol’y 399, 408 (1985).
In the Dred Scott case, “the Court invalidated the Missouri Compromise on the ground thát legislation restricting the institution of slavery violated the implied right of slaveholders.” Obergefell, 576 U.S. at -, 135 S.Ct. at 2616 (Roberts, C.J., dissenting) (citing Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857)). The Court’s holding that blacks could not be American citizens certainly was- absurd and unjust, but no less so than the holding in Obergefell that “marriage” can now be defined as the union of two persons of the same gender.

C. Abraham.Lincoln and the Limits of Judicial Power

In his First Inaugural Address, President Abraham Lincoln stated that the “evil effect” of an erroneous Supreme Court decision is bearable because the effects are limited to that one case:
“I do not forget the position assumed by some that constitutional questions are to be decided by the Supreme Court, nor do I deny that , such decisions must be binding in any case upon the parties to a suit as to the object of that suit, while they are also , entitled to very high respect and consideration in all parallel cases by all other departments of the Government. And while it is obviously possible that such decision may be erroneous in any given case, still the evil effect following it, being limited to that particular case, with the chance that it may be overruled and never become a precedent for other cases, can better be borne than could the evils of a different practice.”
Letters and Addresses of Abraham Lincoln 195-96 (H.W. Bell ed., 1903) (emphasis added). The idea that Supreme Court decisions instantly become the “law of the land,” however, he considered to be not only erroneous, but also dangerous to free government:
“At the same time, the candid citizen must confess that if the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made in ordinary litigation between parties in personal ac *592 tions the people mil have ceased to be their omi rulers, having to that extent practically resigned their Government into the hands of that eminent tribunal.”
Id. at 196 (emphasis added).
Unless, as Lincoln taught, the “evil effect” of Obergefell is limited to the parties in that case, the people “have ceased to be their own rulers,” having surrendered their government into the hands of a majority on the United States Supreme Court. As Justice Scalia states: “Today’s decree says that my Ruler, and the Ruler of 320 million Americans coast-to-coast, is a majority of the nine lawyers on the Supreme Court.” 576 U.S. at -, 135 S.Ct. at 2627. Justice Ruth Bader Ginsburg, one' of that majority, was quoted in a subsequent interview as candidly admitting that the Supreme Court in Obergefell intended to make or “establish” the law. The report of the interview quotes her as stating: “The law that the Supreme Court establishes is the law that [judges, lawyers, and the public] must live by....” Samantha Lachman & Ashley Alman, Ruth Bader Ginsburg Reflects on a Polarizing Term One Month Out, Huffington-Post.com (July 29, 2015).[23] But, as stated above, the Supreme Court does not make law. That power belongs to legislatures or to the formal processes for enacting and amending constitutions.
Indeed, the Supreme Court in recent history has emphasized Lincoln’s observation that judicial power is the power to decide particular cases, not to make general law. As envisioned by the Constitution, “[t]he Judiciary would be, 'from the nature of its functions, ... the [department] least dangerous to the political rights of the constitution’ ... because the binding effect of its acts was limited to particular cases and controversies.” Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 223, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (emphasis added) (quoting The Federalist No. 78, at 522). Indeed, Hamilton considered the judiciary to be the “least dangerous” branch and the damage caused by judicial overreaching to be inherently limited precisely because the impact of its decisions was confined to the case before it. “Thus, ‘though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter: ... so long as the judiciary remains truly distinct from both the legislative and executive.’ ” Plaut, 514 U.S. at 223 (quoting The Federalist No. 78, at 523). The presumption of the Obergefell majority to legislate for the entire nation on a “vital question” by making a decision in a particular Case is exactly the assumption of legislative power that Hamilton warned would endanger “the general liberty of the people” and Lincoln identified with the demise of self-government.

D. The Fallacy of Judicial Supremacy

The general principle of blind adherence to United States Supreme Court opinions as “the law of the land” is a dangerous fallacy that is inconsistent with the United States Constitution.[24] Labeling such opin *593 ions as “the rule of law” confuses the law itself — the Constitution — with an opinion that purports to interpret that document.
Article VI, by its plain terms, binds “the judges in every state” to obedience to the Constitution itself, not to unconstitutional and illegitimate opinions of the United States Supreme Court. Just as the little boy in Hans Christian Andersen’s tale pointed out that the Emperor, contrary to the assertions of his courtiers, was actually stark naked,[25] so also the “judges in every state” are entitled to examine Supreme Court opinions to see if they are clothed in the majesty of the law of the Constitution itself rather than in naked propositions of men with no cognizable covering from that document. As one political scientist observed: “[N]o fiction, however noble, can forever cloak a philosopher king with moral respectability. Soon or late, it seems, his nakedness appears; then we must begin again the struggle for law — for government by something more suitable than the will of those who for the moment hold high office.” Wallace Mendelson, Sex and the Singular Constitution: What Remains of Roe v. Wade?, 26 PS: Political Science and Politics 206, 208 (1993).
The proposition that judgments of the United States Supreme Court are to be obeyed unquestioningly by a lower court regardless of their nonadherence to the Constitution, is known as the doctrine of judicial supremacy. A Princeton professor explains: “Judicial supremacy largely consists of the ability of the Supreme Court to erase the distinction between its own opinions interpreting the Constitution and the actual Constitution itself.” Keith E. Whit-tington, Political Foundations of Judicial Supremacy xi-(2007). By this alchemy thé Court becomes the Constitution, and the actual content of the written charter becomes irrelevant except as literary decoration for its opinions.[26] “The constitutional text itself often plays only a subordinate role [in deciding cases].” Henry Paul Monaghan, Supremacy Clause Textual-ism, 110 Columbia L.Rev. 731, 793 (2010). This miracle of transforming Court opinions into constitutional substance “supposes a kind of transubstantiation whereby the Court’s opinion of the Constitution ... becomes the very body and blood of the Constitution.” Edward S. Corwin, Court Over Constitution 68 (1938). A political science professor states: “A formal constitutional oath to uphold the Constitution amounts, then, to an oath to follow the Court. This mirrors the subversion of the written Constitution: what began as a ■written fundamental law visible to all is translated into the ancient equivalent of legal french for the schooled few.” George Thomas, The Madisonian Constitution 37 (2008).
Opinions of the Supreme Court that interpret the Constitution are, as Lincoln said, “entitled to very high respect and consideration,” but only insofar as they are faithful to that document. In a case like Obergefell, the “evil effects” Lincoln described should be confined to the unfortunate defendants in that case. We must protect the institution of marriage from judicial subversion and maintain loy *594 alty to the principles upon which our nation was founded. Justice Sandra Day O’Connor, the first woman on the United States Supreme Court, stated: “A nation that docilely and unthinkingly approved every Supreme Court decision as infallible and immutable would, I believe, have severely disappointed our founders.” The Majesty of the Law: Reflections of a Supreme Court Justice 45 (2003).
Finally, we should reject the conversion of our republican form of government into an aristocracy of nine lawyers. Speaking at the North Carolina ratification convention in 1788, James Iredell, soon to be a Supreme Court Justice, explained that the Guarantee Clause[27] was placed in the Constitution so that “no state should have a right to establish an aristocracy or monarchy.” 4 Elliot’s Debates, at 195. If the Guarantee Clause is offended by a state’s abandoning representative government, how much more is it offended by the judicial branch of the national government imposing an aristocratic form of government on every state in the union? The colonists, we should remember, charged King George III with “altering fundamentally the Forms of our Governments.” Declaration of Independence para. 2.
E. Did Obergefell Automatically Abrogate the March 2015 Orders in this Case?
Lincoln taught that an order of the Supreme Court was limited to the parties in the case before the Court; beyond that it served merely as precedent. He agreed that Dred Scott as a judicial judgment bound the parties to that case, but cautioned against granting it any broader scope. Likewise, following .Lincoln’s admonition, the ruling .in Obergefell bound only the parties before the Court in that case.[28]
Some contend, however, that Obergefell, by its mere existence, abrogates the March 2015 orders in this case. Those orders, of course, were not the subject of review in Obergefell. On October 20, 2015, a panel of the United States Court of Appeals for the Eleventh Circuit summarily affirmed the order of the United States District Court for the Southern District of Alabama “requiring the issuance of marriage licenses to same-sex couples.” Strawser v. State (No. 15-12508-CC, Oct. 20, 2015) (11th Cir.2015). “Since the filing of this appeal,” the Eleventh Circuit stated, “the Alabama Supreme Court’s order was abrogated by the Supreme Court’s decision in Obergefell v. Hodges...” Id. That conclusion is plainly wrong.
For example, the United States Court of Appeals for the Eighth Circuit recently ruled that Obergefell did not directly invalidate the marriage laws of states under its jurisdiction. Applying Obergefell as precedent, the Eighth Circuit rejected the Nebraska defendants’ suggestion that Oberge-fell mooted the case. The Eighth Circuit stated: “The [Obergefell ] Court invalidated laws in Michigan, Kentucky, Ohio, and *595 Tennessee — not Nebraska.” Waters v. Ricketts, 798 F.3d 682, 685 (8th Cir.2015) (emphasis added). In two other eases the Eighth Circuit repeated its statement that Obergefell directly invalidated the laws of only the four states in the Sixth Circuit. See Jernigan v. Crane, 796 F.3d 976, 979 (8th Cir.2015) (“not Arkansas”); Rosenbrahn v. Daugaard, 799 F.3d 918, 922 (8th Cir.2015) (“not South Dakota”). The United States District Court for the District of Kansas was even more explicit: “ “While Obergefell is clearly controlling Supreme Court precedent,’ it ‘did not directly strike down the provisions of the Kansas Constitution and statutes that bar the issuance of same-sex marriage licenses_’ ” Marie v. Mosier, 122 F.Supp.3d 1085 (D.Kan.2015). Rejecting the Kansas defendants’ claim that Obergefell mooted the case, the district court stated that “Obergefell did not rule on the Kansas plaintiffs’ claims.” Id.
The opinion of the Obergefell majority initially agreed with this analysis, holding that “the State.laws challenged by Petitioners in these cases are now held invalid.” 576 U.S. at -, 135 S.Ct. at 2605 (emphasis added). Toward the end of its opinion, however, the majority presumed to make its edict apply to the entire nation. “The Court, in this decision, holds same-sex couples may exercise the fundamental right to marry in all States.” 576 U.S. at -, 135 S.Ct. at 2607 (emphasis added). But that holding is beyond its authority and should be regarded as dicta. As Lincoln observed in his first Inaugural Address and as Hamilton instructed in Federalist No. 78, a judicial decision is not a legislative enactment; it binds only the parties to the ease. “Courts do not write legislation for members of the public at large; they frame ^decrees and judgments binding on the parties before them.” Additive Controls & Measurement Sys. v. Flowdata, Inc., 96 F.3d 1390, 1394 (Fed.Cir.1996). The Court had no jurisdiction to order nonparties to Obergefell to obey its judgment for they have not had an opportunity to appear and defend. “A judgment or decree among parties to a lawsuit resolves issues as among them, but it does.not conclude the.rights of strangers to those proceedings.” Martin v. Wilks, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Judge Learned Hand stated:
“[NJo court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen,[29] and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.”
Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 832-33 (2d Cir.1930) (emphasis added).
Rule 65 of fhe Federal Rules of Civil Procedure, which governs the scope of the district court injunctions that were under review in Obergefell, states, in part:
“(2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:
“(A) the parties;
“(B) the parties’ officers, agents, servants, employees, and attorneys; and
*596 “(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).”
Rule 65(d)(2), Fed.R.Civ.P. (emphasis added). No Alabama probate judges were parties to Obergefell. Neither were they officers, agents, or servants of any of the defendants in those cases, or in active concert or participation with any of them. The Obergefell defendants were state officials in the four states in the jurisdiction of the United States Court of Appeals for the Sixth Circuit, namely Kentucky, Michigan, Ohio, and Tennessee. Needless to say, Alabama probate judges were not agents, servants, or employees of any of those state officials. Nor were they in “active concert or participation” with any of them. Thus, the judgment in Obergefell that reversed the Sixth Circuit’s judgment does not constitute an order to Alabama probate judges.
Accordingly, the Eleventh Circuit was incorrect to hold that Obergefell abrogated the March orders in this case. Furthermore, this Court is ‘“not bound by the decisions of the Eleventh Circuit.’ ” API, 200 So.3d at 529 (quoting Ex parte Hale, 6 So.3d 452, 458 n. 5 (Ala.2008)). “Legal principles and holdings from inferior federal courts have no controlling effect here_” API, 200 So.3d at 529 (quoting Glass v. Birmingham So. R.R., 905 So.2d 789, 794 (Ala.2004)). In a 1991 case, the United States Court of Appeals for the Ninth Circuit adopted a different position, holding that federal district court decisions did not bind state courts but that the decisions of the federal courts of appeal most likely did. “[TJhere may be valid reasons not to bind the state courts to a decision of a single federal district judge— which is not even binding on the same judge in a subsequent action — that are inapplicable to decisions of the federal courts of appeals.” Yniguez v. State of Ariz., 939 F.2d 727, 736-37 (9th Cir.1991). On review, the United States Supreme Court termed this statement “a remarkable passage” and contrasted it with the following:
“But cf. ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989) (‘state courts ... possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law); Lockhart v. Fretwell, 506 U.S. 364, 375-376 (1993) (Thomas, J., concurring) (Supremacy Clause does not require state courts to follow rulings by federal courts of appeals on questions of federal law).”
Arizonans for Official English v. Arizona, 520 U.S. 43, 58 n. 11, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). The Chief Judge of the Eleventh Circuit noted this commentary. Citing Arizonans, he stated: “The Supreme Court has rejected and disparaged as ‘remarkable’ a passage from a Ninth Circuit opinion saying that state courts are bound to follow rulings of the federal court of appeals in the circuit in which they are located.” Hittson v. GDCP Warden, 759 F.3d 1210, 1278 (11th Cir.2014) (Carnes, J., concurring). Acknowledging that federal and state courts have independent and parallel obligations to interpret federal law, he stated: “[I]t is not the role of inferior federal courts, of which we are one, to sit in judgment of state courts on issues of federal law.... We have no more right to lecture state courts about federal law than they have to lecture us about it.” Id. See also Powell v. Powell, 80 F.3d 464, 467 (11th Cir.1996) (noting “the dual dignity of state and federal court decisions interpreting federal law”). As the United States Supreme Court explained in ASARCO v. Kadish, 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989): “Indeed, inferior federal courts are *597 not required to exist under Article III, and the Supremacy Clause explicitly states that ‘the Judges in every State shall be bound’ by federal law. U.S. Const., art. VI, cl. 2.” 490 U.S. at 617.
For the above reasons, the Eleventh Circuit is incorrect that Obergefell abrogated the March 2015 orders in this case. Additionally, a ruling of the Eleventh Circuit has no binding effect on this Court.

VI. Conclusion

The dissents of Chief Justice Roberts, Justice Scalia, Justice Thomas, and Justice Alito provide ample justification to refuse to recognize Obergefell as a legitimate judicial judgment. Obergefell constitutes an unlawful purported amendment of the Constitution by a judicial body that possesses no such authority. As Chief Justice Roberts stated: “The right [Obergefell] announces has no basis in the Constitution or this Court’s precedent.” 576 U.S. at -, 135 S.Ct. at 2612.
In 1785, James Madison, widely recognized as the chief architect of the Constitution and who would later become the fourth President of the United States, wrote to the Virginia Assembly:
“The preservation of a free Government requires, not merely that the metes and bounds which separate each department of power may be invariably maintained, but more especially that neither of them be suffered to overleap the great Barrier which defends the rights of the people. The rulers who are guilty of such an encroachment, exceed the commission from which they derive their authority, and are Tyrants. The people who submit to it are governed by laws made neither by themselves nor by an authority derived from them, and are slaves”
“A Memorial and Remonstrance,” in 1 Letters and Other Writings of James Madison 163 (1865). In Obergefell, a bare majority of five Justices in the face of four vigorous and vehement dissents violated both requirements for “[t]he preservation of a free government.” Rather than limiting themselves to the judicial function of applying existing law to the facts and parties before them, the Obergefell majority violated “the metes and bounds which separate each department of power” by purporting to rewrite the marriage laws of the several states to conform to their own view of marriage. Condemning this usurpation of the legislative function, Chief Justice Roberts in an adamant dissent explained that “this Court is not a legislature.” 576 U.S. at -, 135 S.Ct. at 2611. “Five lawyers,” he lamented, “have closed the debate and enacted their own vision of marriage as a matter of constitutional law.” 576 U.S. at -, 135 S.Ct. at 2612.
Even more injurious to the rule of law, the Obergefell majority “overleap[ed] the great Barrier which defends the rights of the people” as expressed in the Free Exercise Clause of the First Amendment. The majority thus has jeopardized, the freedom to worship God according to the dictates of conscience and the right to acknowledge God as the author and guarantor of true liberty. Justice Thomas in his dissent explained: “Aside from undermining the political processes that protect our liberty, the majority’s decision threatens the religious liberty our Nation has long sought to protect.” 576 U.S. at -, 135 S.Ct. at 2638. Justice Joseph Story further explained: “The rights of conscience are, indeed, beyond the just reach of any human power. They are given by God, and cannot be encroached upon by human authority, without a criminal disobedience of the precepts of natural, as well as of revealed religion.” 2 Joseph Story, Commentaries on the Constitution-% 1876 (2d ed. 1851).
*598 A vivid example of the practical effect of the unwarranted trampling of rights of conscience by the Obergefell majority is the, jailing of a Kentucky county clerk for adhering to her religious conviction that God has ordained marriage as an institution that unites only a man and a woman. She stated: “To issue a marriage license which conflicts with God’s definition of marriage, with my name affixed to the certificate, would violate my conscience.” Statement of Kentucky Clerk Kim Davis, Sept. 1,2015.[30]
By transgressing “the metes and bounds which separate each department of power” and “overleaping] the great Barrier” which protects the rights of conscience, the Obergefell majority “exeeed[s] the commission from which they derive their authority” and are “tyrants.” By submitting to that illegitimate authority, the people, as Madison stated, become slaves. Free government, rather than being preserved, is destroyed.
Obergefell itself is the corrupt descendant of the Court’s lawless sexual-freedom opinions that hearken back to Griswold — a “derelict in the stream of the law,” State Bd. of Ins. v. Todd Shipyards Corp., 370 U.S. 451, 457, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962). The great irony of the Supreme Court’s embrace of the homosexual campaign to redefine marriage is that the homosexual movement has embraced marriage only for the purpose of destroying it. The ultimate goal of that movement is to drive the nation into a wasteland of sexual anarchy that consumes all moral values.
Obergefell is completely without constitutional authority, a usurpation of state sovereignty, and an effort to impose the will of “five lawyers,” as Chief Justice Roberts stated, 576 U.S. at -, -, 135 S.Ct. at 2612, 2624, on the people of this country. Indeed, the Obergefell majority even presumes to override the Federal Rules pf Civil Procedure, which limit the applicability of injunctions to parties, their agents, and those acting in concert with them.
Our forefathers would not have stood idly by to watch our liberties destroyed and our Constitution violated. James Madison stated in 1785 that “it is proper to take alarm at the first experiment on our liberties,... We revere this lesson too much, soon to forget it.” “A Memorial and Remonstrance,” in 1 Letters and Writings, at 163, 1 believe that in the Obergefell opinion and the response of many to it, we may have forgotten that lesson sooner than we ought.
In my legal opinion, Obergefell, like Dred Scott and Roe v. Wade that preceded it, is an immoral, unconstitutional, and tyrannical opinion. Its consequences for our society will be devastating, and its elevation of immorality to a special “right” enforced through civil penalties will be completely destructive of our religious liberty. Why immoral?
Because it elevates into a fundamental right that which was historically regarded by our law as “the infamous crime against nature,” which fundamental right Justice Scalia ironically observes was “overlooked by every person alive at the time of ratification, and almost everyone else in the time since.” 576 U.S. at -, 135 S.Ct. at 2629.
Why unconstitutional?
Because “the Constitution ,.. had nothing to do with it,” 576 U.S. at -, 135 S.Ct. at 2626 (Roberts, C.J., dissenting), *599 and because it is a “distortion of our Constitution” that “ignores the text” of the Constitution. 576 U.S. at -, 135 S.Ct. at 2631 (Thomas, J., dissenting).
Why tyrannical?
Because the Obergefell opinion “shows that decades of attempts to restrain this Court’s abuse of its authority have failed,” 576 U.S. at -, 135 S.Ct. at 2643 (Alito, J., dissenting), and because Obergefell “will be used to vilify Americans who are unwilling to assent to the new orthodoxy” and “exploited by those who are determined to siamp out every vestige of dissent.” 576 U.S. at -, 135 S.Ct. at 2642 (Alito, J., dissenting).
In addition, Obergefell contradicts “the Laws of Nature and of Nature’s God” that were invoked in the organic law upon which our country is founded. Declaration of Independence para. 1. To invariably equate a Supreme Court decision that clearly contradicts the Constitution with “the rule of law” is to elevate the Supreme Court above the Constitution and to subject the Anierican people to an autocracy foreign to our form of government. Supreme Court Justices are also subject to the Constitution. When “that eminent tribunal” unquestionably violates the limitations set forth in that document,' lesser officials — equally bound by oath- to ' the Constitution — have a duty to recognize that fact or become guilty of the same transgression.
“ ‘[T]he central principle of a free society [is] that courts have finite bounds of authority, some of constitutional origin, which exist to protect citizens from ... the excessive use of judicial power.- The courts, no less than the political branches of the government, must respect the limits of their authority.’ ”
State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 n. 1 (Ala.1999) (quoting United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 77, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988)).
In face of the lawlessness of the Oberge-fell majority, I agree with the dissenting opinion of Chief Justice Roberts: “If you are among the many Americans ... who favor expanding same-sex marriage, by all means celebrate today’s decision.... But do not celebrate the Constitution. It had nothing to do with it.” 576 U.S. at -, 135 S.Ct. at 2626 (emphasis added).
As stated at the beginning of this special concurrence, the certificate of judgment in this case does not disturb the March 2015 orders of this Court that uphold the constitutionality of the Sanctity of Marriage Amendment and the Alabama Marriage Protection Act. For that reason, as explained above, I concur.

. The United States Code, “the official codification of the general and permanent laws of the United States,” includes the Declaration of Independence in the section entitled "The Organic Laws of the United States of America.” See Black’s Law Dictionary 1274 (10th ed. .2014) (defining "organic law” as "[t]he body of laws (as in a constitution) that define and establish a government”).

. Sir William Blackstone described as an "aristocracy” that form of government in which the sovereign power "is lodged in a council, composed of select members.” 1 Commentaries *49.

. "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.” U.S. Const, amend. IX. "The powers hot delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” U.S. Const, amend. X.

. This warning was quoted virtually verbatim in Justice White’s majority opinion in Bowers v. Hardwick, 478 U.S. 186, 194, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

. In a concurring opinion Justice Shaw states that a judge who "cannot abide by a controlling decision of a higher court” should resign. 200 So.3d at 618. In support of this assertion, he quotes from an article in which Justice Scalia criticized Justices on the Supreme Court who let their personal views of the morality of the death penalty override constitutional and state law to the contrary. Anto-nin Scalia, God’s Justice and Ours, 2002 First Things 123 (May 2002), In Obergefell, a majority of five Justices supplanted state marriage laws with no authority whatsoever in the Constitution. Under Justice Scalia’s logic, the Justices who elevated Obergefell above the Constitution they swore to uphold should themselves resign, and not state judges who uphold that sacred document.

. By constitutionalizing attacks on the procreative core of marriage, the Supreme Court has greatly contributed to the erosion of this institution. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (contraception); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (abortion).

. The Bible likens marriage to the relationship between Christ'and the church. Ephesians 5:22-27. The Obergefell majority ere-ates an unnatural form of marriage whose participants delight in "vile affections.” Romans 1:26.

. Justice Black is describing this philosophy, not agreeing with it. "For myself, I must with all deference reject that philosophy.” Griswold, 381 U.S. at 522 (Black, J., dissenting).

. Justice Holmes referred to this tendency of the Court to discover constitutional novelties in the Fourteenth Amendment as "evoking a constitutional, prohibition from the void of 'due process of law.’ ” Baldwin v. Missouri, 281 U.S. 586, 596, 50 S.Ct. 436, 74 L.Ed. 1056 (1930) (Holmes, J., dissenting).

. One may reasonably surmise that in the era of fears about a population explosion, the Court felt that its duty to limit the reproduction of die masses superseded any fealty to the text of tire Constitution. Eisenstadt represented the Court's first sustained assault on sexual morality and laid the groundwork for future decisions that were consistent with a policy of reducing population growth, either through abortion (killing the conceived) or homosexuality (promoting nonreproductive sexuality). In a 2009 interview, Justice Ruth Bader Ginsburg stated: "Frankly I had thought that at the time Roe was decided, there was concern about population growth and particularly growth in populations that we don’t want to have too many of.” Emily Bazelon, The Place of Women on the Court, New York Times Magazine (July 7, 2009).

. "By placing a premium on ‘recent cases’ rather than the language of the Constitution, the Court makes it dangerously simple for future Courts, using the technique of interpretation, to operate as a ‘continuing Constitutional convention.’ " Coleman v. Alabama, 399 U.S. 1, 22-23, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (Burger, C.J., dissenting). As two scholars have noted, ‘‘[E]stablishing a tradition through reliance on Supreme Court cases is bootstrapping.” Nelson Lund & John O. McGinnis, Lawrence v. Texas and Judicial Hubris, 102 Mich. L.Rev. 1555, 1610 (2004).

. http://www.guttmacher.org/statecenter/ spibs/spib_RPHS.pdf. (On the date this special writing was released, this information could be found at the preceding Web address.)

. http://www. nydailynews .com/news/national/tenn-county-clerk-staffresigns-gay-marriage-raling-arti-cle-1.2281567. (On the date this special writing was released, this information could be found at the preceding Web address.)

. http://www.foxnews.com /opinion/2015/08/ ll/chaplains-banned-frompreaching-that-homosexuality-is-sin.html. (On the date this special writing was released, this information could be found at the preceding Web address.)

.Booth was an abolitionist whom federal authorities charged with assisting in the escape of a captured fugitive slave. The Wisconsin Supreme Court affirmed the issuance of a writ of habeas corpus to release Booth from federal custody.

. One Justice indeed dissented outright and stated; "Marriage is not only for the parties. Its purpose is to provide children with a safe and stable environment in which to grow. It is the epitome of civilization. Its definition cannot be changed by legalisms." Costanza, 167 So.3d at 624 (Hughes, J„ dissenting).

. James Iredell’s Charge to the Grand Jury, Case of Fries, 9 Fed.Cas. 826, no. 5, 126 (C.C.D.Pa.1799). Iredell served as a Justice of the United States Supreme Court from 1790 to 1799.

. "Senators and Representatives [of the United States], and the ¾/Iembers of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation to support this Constitution." U.S, Const., art. VI, ¶ 3 (emphasis added).

. See Windsor v. United States, 699 F.3d 169, 188 (2d Cir.2012), aff'd, 570 U.S. —, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (noting that “same-sex marriage is unknown to history and tradition").

. "Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh.” Genesis 2:24. “Marriage is honourable in all, and the bed undefiled:' but whoremongers and adulterers God will judge.” Hebrews 13:4.

. http://www.huffingtonpost.com/entry/ruth-bader-gihsburgtk_55b97c68e4b0b8499bl8536 b. (On the date this special writing was released, this information could be found at the preceding Web address.)

. Justice Shaw’s concurrence reflects his errant judicial philosophy of blind adherence to an unlawful, illegitimate, and unconstitutional decision of the United States Supreme Court. Because Justice Shaw was the only Justice in this case who declined to affirm the validity of the Sanctity of Marriage Amendment and the Alabama Marriage Protection Act before the United States Supreme Court decision in Obergefell, and thereafter recommended to this Court that it take no further official action in this case, even after this Court request *593 ed further briefing from the parties, he is understandably upset that this Court now proceeds to act.

. "The Emperor's New Clothes,” in The Annotated Hans Christian Andersen 3-16 (Maria Tatar ed., 2008).

. Justice Abe Fortas, for example, according to one of his clerks, viewed legal analysis as a "necessary form of packaging that had to be provided for things he wanted to do.” Laura Kalman, Abe Fortas: A Biography 271 (1990). After revising one memorandum, Fortas returned it to his clerk with the brief order: “Decorate it.” Id. at 271-72.

. "The United States shall guarantee to every State in this Union a Republican Form of Government_" U.S. Const., art. IV, § 4.

. Justice Shaw terms my arguments about the scope of federal court decisions "silly” and "nonsensical.” 200 So.3d at 618. His comments demean the office he holds and diminish the dignity of this Court. He fails to distinguish between the scope of a federal court judgment and the precedential effect of a federal court opinion. The first is binding as to the parties; the latter is only precedent for future cases and is legitimately subject to skepticism if it lacks any basis in the Constitution. The doctrine of judicial supremacy, as propounded by Justice Shaw, would remove all moral responsibility from judges, whose sole duty would be to follow the orders of their superiors. Nuremberg has taught the pemiciousness of such a doctrine.

. "Pro tanto brutum fulmen” means "to that extent,” "an empty threat.” Black's Law Dictionary 234, 1417 (10th ed. 2014).

. http://www.lc.org/news room/details/statement-of-kentucky-clerk-kimdavis-1. (On the date this special writing was released, this information could be found at the preceding Web address.)